Case No. 18-15-04, Billy F. Hawk Jr v. Commissioner of the Federal Revenue, and I'm going to ask Commissioner Butler to come forward. Good afternoon, Your Honors. May it please the Court, my name is Eric Butler. Here on behalf of the petitioners below in the United States Tax Court, along with my co-counsel, Mr. David Garbett. Your Honors, this is one of the mid-coast transactions that has occurred across the United States for the past several years. While this case arose in tax court, the main issues before this court are of state law, and that is whether, first, Holiday Bowl was insolvent under the Tennessee Uniform Fraudulent Transfer Act, and two, whether the Tennessee Supreme Court would allow what the government refers to as recasting, taking the transaction as it was originally intended and collapsing it down into a liquidation. With regard to the insolvency issue, the court below found that the shareholders were constructively fraudulent. Under TCA 66-3-306A. The insolvency issue is dispositive here because if the court finds there was solvency, we need go no further. Because there's no liability under state law, which is the key issue. The numbers that the tax court had below in the record, begin with the opening balance in Morris Manning's Aulta account on November 12, 2003. That balance was $2.6 million, and that's conceded by both sides. The government conceded that below at trial. Both sides also agree that the same day of the closing, November 12, 2003, Holiday Bowl's cash, $4.2 million, was wired into that account. Later that day, $3.45 million, the purchase price, was wired back to the Holiday Bowl shareholders. If you apply FIFO accounting, which the Tennessee courts apply to commingled funds, that reflects the Holiday Bowl received back $892,000. Everyone agrees that on the closing November 12, 2003, the estimated 2003 tax liability for the corporation was $1.2 million. If you take the $4.2 million in cash, and you subtract out the $892,000 we received back, that makes Holiday Bowl net solvent $3.3 million. But would it have enough money to pay tax liabilities? It would, Your Honor. All of them? Yes, sir. So if you take the $4.2 million that we had cashed that got wired into that account, and then FIFO says we get $892,000 back, that leaves them net $3.3 million, with a $1.2 million tax liability, and they're completely solvent. This only works if you don't collapse the transactions, though. That is correct, Your Honor. I thought the heart of the matter from your perspective was whether under Tennessee law, there's a good faith defense. In other words, there's no bad intent on your client's perspective. And I thought that was really the heart of the debate under Tennessee law. Am I missing that? It is, Your Honor. As the tax court noted... Because if you don't, I guess just to tell you where I'm coming from, if you don't need to show bad faith by your clients, it doesn't matter. You could still collapse the transaction. That's what these circuits have grappled with is the issue of even though it's a constructively fraudulent transfer, which obviously requires no knowledge under the statute, you still have this threshold inquiry under Commissioner v. Stern where you've got to look at can I collapse before I have to take that recast transaction and apply the constructively fraudulent statute. The circuits have said... Just to make sure I'm speaking the right language here, I thought there was... you actually have two different collapsible issues. On the 6901 threshold question, there's a question there about collapsing when it comes to who's a transferee. But then under Tennessee law, assuming you get to that, that also effectively is doing something similar when it comes to constructive fraud. Am I right about that? Well, Commissioner v. Stern stands for the proposition that you can't... the federal analysis does not come into play. It's a state issue. It's whether the state allows you to collapse it. So the Commissioner has tried in these various cases to argue that we get to recast it at the federal level, the 6901 level, then put that through the state test and basically skip that analysis down to the state level to apply the statute. I agree. We can't do that. State law applies. What's your best argument that Tennessee doesn't recognize constructive fraud? Because that seems like it's the heart of this part of the case. So Stern requires that when you look at the recasting issue at the state level... You look at Tennessee law. You do. And Tennessee, as the tax court noted, Tennessee has no case saying that you can collapse a transaction under Tufta to recast it in the form the Commissioner requests that you do. But having no case doesn't tell us the answer. There is a case, Your Honor. There's a Taylor v. George case from the Tennessee Court of Appeals where the court was asked to look at a similar issue. And that being where a trustee of a trust for the benefit of a brother had an ex-wife who was trying to collect spousal benefits from him. Her allegation, the wife's allegation, was that the husband colluded with the sister to get those distributions out of the trust to avoid paying them to the sister. Tennessee Court of Appeals looks at Tufta and says, we find no provision where a trustee, because the fraudulent conveyance statute requires it to be a transfer on behalf of the debtor, and the debtor was the husband. It was the trustee that was making the transfer.  And we do not find any provision in the statute that would allow us to say a transferee is, or trust is a transferee on behalf of this debtor. But what about the argument that Tufta was supposed to replace a law, a uniform proposed law, and not have a good faith, bad faith inquiry? What do you do with that? I would argue that Stern requiring you to look at state law under Tufta, it's got to be under Tufta. You've got cases that reflect that the court, the Tennessee courts would not necessarily allow a collapsing of this transaction. And I would say to the court to keep in mind that the ruling here would not only impact the IRS, it's going to impact every non-IRS creditor under Tufta. And this is a very unique fact pattern. In fact, Michigan Court and Alliance Bank Court, which we saw in our reply brief held, that Tufta was, the Uniform Fraudulent Transfer Act, was not intended to apply to a circumstance similar to this where you have stolen funds. So the statute itself, I would argue, was never designed to deal with this type of a transaction with very complicated steps involved. Don't the courts generally say under the Uniform Fraudulent Transfer Acts that you can look at the reality or the substance of the transaction as opposed to just the formalities of it? Some do, Your Honor. In the other circuit cases that have dealt with this issue, they have cited to a specific state case where that court has said under their Fraudulent Transfer Act— Don't all of the Uniform laws, if I'm recalling correctly, don't they all have a provision that says, hey, we like to interpret our law to be consistent with everybody else's interpretation of these Uniform laws, right? Uniformity. I mean, Tennessee has a uniformity provision, right? We do, Your Honor. And I think that goes to the tax court's method of getting to the collapsing by pointing to the Tennessee statute and saying, we will incorporate equitable principles under the statute. I would point out, though, that in that definitional section of the statute, it also talks in terms of mistake as well. And it's inequitable to impose liability on shareholders who basically mistakenly received back funds from an escrow violation. If the court determines that they did receive back some of their own funds, because we made the argument below that one of our alternatives was we have a valid loan here, it should be respected. Can I ask you this question? I mean, so this case looks a lot like Feldman without the Sequoia loan, right? You would agree with me? Distinguishable on the basis that the loan in Feldman came from Ms. Shapiro, a 50% owner in Midcoast. It was a personal loan. And the court held there were no loan documents, which is not the case here. Right. So I'm trying to set up the question. So the question is, with the Sequoia loan, the question is whether we respect that and how much it does or doesn't look like Feldman. Without the Sequoia loan, I'd say it's Feldman, right? Let's just imagine, no Sequoia loan at all. I know that's not the case. And it's Feldman, right? It's closer to Feldman, Your Honor. And don't you think you would lose without the Sequoia loan? I mean, it's just direct. It's between Holiday Bowl and Midcoast. You still have the issue. It's just cash for cash plus tax liabilities. The distinguishing factor between us and Feldman, Your Honor, is that the tax court found there were post-closing transfers. In the record, he found there was money moving through the account post-closing. Well, let's forget Feldman. Wouldn't you have a problem if it was just one pile of cash with some tax liabilities straight to Midco? No independent financing, just day-to-day. Here's my cash. Here's the cash back with a little accounting for the fact you don't have to pay the tax liabilities. But I think the distinguishing factor... Would that be a problem? It would be a problem, but I think the way we overcome it... Because you wouldn't respect... You wouldn't allow them to unload their tax liabilities that way if Midco is in a real entity, right? I think what Your Honor is asking is the... What was Midco saying to these shareholders was the tax strategy, the tax minimization strategy? And what did the shareholders understand when they were being told this by Midco? Yes. Where I think this is... They want to buy these tax gains because they have a business that generates tax losses, right? The losses... Allegedly. The losses, as explained to the shareholders, were the offsets from the operation of an asset recovery business, which the government's expert testified on cross-examination that there are ways, legitimate ways that the shareholders could have understood that in operating this asset recovery business, that losses could be generated and carried back, amended returns could be filed. So what's the answer to the question? Everything else is the same in this case. The knowledge they have, Midco is who Midco is, there's no Sequoia loan at all. So they're just out of the transaction. What happens? We are still solvent post-closing. And there's no insolvency under the statute. The government cannot... There's no bad faith and you think that's required. If you're going to collapse, I do. Do you think you could have gotten a tax opinion from an attorney that would have said this is a kosher transaction? The advisors did not, Your Honor. In fact, they issued their own opinions to these shareholders that supported the legitimacy of the transaction. No, my point was you could have gotten that opinion without Sequoia in the middle of it. A tax opinion? Yeah. They could have, but they didn't. That's just not in the record. They never sought a tax opinion. What I'm trying to figure out is if this all turns on whether the Sequoia loan is real or not, whether there was truly risk involved, whether that part is a sham or not. And I guess you're not resting your hat entirely on that legitimacy of Sequoia loan is what I take you to be saying. I would argue that the loan is legitimate because the tax court found post-closing, the transfers in the opinion to Midcoast and to the 3.9 to the capital security bank account, if you go to the agreements Sequoia had with Midcoast to purchase these shares post-closing, those are the numbers the tax court is referring to in its opinion. So the movement of money post-closing shows Holiday Bowl had possession of 4.5 million post-closing and is therefore not insolvent. So the government loses on that essential element alone. The court doesn't even need to go to the other issue because the solvency is there. That's proven by the tax court's own opinion. The legitimacy or not of the Sequoia loan, what part of the analysis does that affect? If you could just help me make sure I'm understanding tax law. So you have under 6901 this threshold question of whether you're actually a transferee or as defined, a distributee. So if one is skeptical of the Sequoia loan, is that relevant to whether you're a transferee, distributee? In other words, if it's a perfectly legitimate loan, there's true risk, everything about it is perfectly fine. Would that mean you wouldn't even get to Tennessee law because they wouldn't even be a transferee? Is that how you would look at it?  So there's three alternative ways we win here. Number one. I'd love it if you answered the question I asked, and then you can say that. But it just never helps for you to go back to what you know and not answer the question I asked. I understand. Your question is, absent the Sequoia loan, I want to make sure I understand. Let's just assume you're right. It's a perfectly legitimate loan. Everything about it is legit. The paperwork's legit. There's true risk involved. There's true collateral. I'm asking you, if that's all true, does that mean we don't even get to Tennessee law? Because at 6901, you have to be a transferee, defined to be a distributee, and the distributee just wouldn't have been the Hawks. You still have to get to Tennessee law, Your Honor. You do? I do. They would still be a distributee under 6901. Okay. It's a two-step analysis, and the courts have made clear this point. So that makes me think collapsibility has nothing to do with 6901. It doesn't. Collapsibility only goes to Tennessee law. That's correct. That is what Stern compels, is that the court go to. And that's the Dobbled case, held the same, the one the tax court cites for the authority to do. It's collapsing. It held. You've got to show under New York law in Dobbled that this is permitted under the state's Uniform Fraudulent Transfer Act. Thank you, Your Honor. All right. You get your full rebuttal. Thank you. Mr. Catterall? You can start however you wish, but I'd just be curious, the last question I asked, just trying to make sure I'm understanding when legitimacy or illegitimacy of certain parts of the transactions, what do they go to? So I don't know if you heard that last question. No. You have to be a transferee under Section 6901. Of course. To get there, you apply the Federal Substance Overform Doctrine to recharacterize the transaction. So my question is if the Sequoia loan, everything about it is 100% legit, they're acquiring tax gains, and they're using the Sequoia part of the transaction in a legitimate way in all respects, would we still get into collapsibility? Yes. Okay. So you get into collapsibility at both stages? Absolutely. Yeah. And as counsel indicated, we had initially argued that you apply the Federal Doctrine, and then you keep that characterization and apply state law to the transaction as recharacterized under Federal law. And that's been rejected, and we're no longer making that argument. So yes, you have to do the, you have to recharacterize. You could potentially have different outcomes. It's collapsible at the Federal level and not collapsible at the state level. Yes, yes. If I may, let me first address the question of insolvency. The taxpayers are arguing that the transfer of the $3.45 million to the shareholders out of the escrow agent's IOLTA account on November 12th did not render the corporation insolvent because Tennessee law allegedly dictates the conclusion that all but $892,000 of that amount consisted of other people's money kept in the IOLTA account. Now, even if that were somehow correct, the corporation would undoubtedly be obligated to replenish the drained accounts of its unwitting benefactors, and that's another obligation. So, you know, that's a $2.5 million obligation right there. Add that, add the $1.2 million tax liability, you get $3.7 million of liability, and that would exceed the $3.3 million of assets that the corporation would be deemed to have retained under that rather fanciful theory. So the escrow account is just the law firm's IOLTA account? That's my understanding. Otherwise their IOLTA account, so all the money that was in there was somebody else's money? There was about $2.5 million of other people's money, and then Holiday Bowl's cash came in. And so they're making this argument that, well, under this FIFO analysis, you know, other people's money went out to the shareholders. And even if that's somehow true, clearly the corporation is going to have to replenish the other people's accounts. And that's, you know, so there's a $2.5 million liability right there. And added to the tax liability. I think I get this point. Tell me, is there a way they could have done what they set out to do without creating these problems? So in other words, it is legit in the abstract to have tax, embedded tax gains, and do a transaction, merger or otherwise, that takes advantage of a company that is in the business of generating tax losses. Presumably not forever, but... It's very difficult to do. There's a plethora of not only judicial doctrines, but... What would they have had to do here? Could they have done it here with Midcoast and this, just everything else the same? The family has this cash. They sell the bowling alleys. It has embedded corporate tax liabilities and... Well, no, I don't think you can do it... I don't think you can do it when you start out, when you've already sold all the assets of the corporation. Why is that? Because, I mean, as this court held in the Owens case, a sale of the stock of a corporation that's holding only cash is an economically meaningless gesture. I mean, it's a cash for cash exchange. No, but that's, I mean, well, I guess this is what I'm trying to figure out. It doesn't seem meaningless. There's economic substance to it because they have these embedded tax obligations, and it seems like it happens quite often that companies want to match that. There's a benefit to someone with tax losses. I don't think it happens... That's the essence of the transaction. I don't think it happens often where you've got a corporation that sells all its assets, and it's only holding cash and a tax liability. And, you know, somebody wants... I'm sorry? So this transaction gets legit if they do everything else the same except sell it while they still have the bowling alleys? Yeah, sure. I mean, of course, if they didn't sell the assets first, they wouldn't have the tax liability that they're trying to get rid of. But, you know, I mean, and if you're asking are there legitimate ways that, you know, third-party purchasers can acquire a corporation with a tax liability and utilize that, there is. But, I mean, it's... First of all, there's a code section 269 which basically says any acquisition of a corporation solely for purposes of utilizing that corporation's tax attributes can be disregarded. How did they get these tax opinions? Didn't they get opinions? I mean, they're innocents in one sense. They may have thought it looked like a great deal. In that sense, they're not innocent. But they certainly look like taxpayers who didn't think this was fraud. Again, I mean, it's not so much the idea of, you know, the purchaser is going to generate these attributes that can take care of our gain. It's not so much that. It's the idea that a sale of a corporation holding only cash has any economic subject. Your view would be the Sequoia loan has nothing to do with this. It's an independent... It's a problematic transaction even if all parts of the loan are real, real risk, real collateral, all the papers signed. It would make no difference to your position. And we have had courts that have recharacterized the transaction even though the loan was not shammed. So if it's a problematic transaction, that's only enough for you to prevail if there's no knowledge requirement. Being a problematic transaction alone doesn't get you to where you need to be if there's a knowledge requirement and you can't... If there's a knowledge requirement. Okay. And what... I'm confused here. So the constructive fraud is they knew or should have known that the new entity, the purchasing entity, was not going to pay the taxes, right? Right. They didn't intend to pay the 2003 tax liability. Right. I get lost there because I don't see the evidence. I see the evidence where the Hawks should have known. Okay, yes, they knew that this was a tax avoidance scheme. They may have even known that it was a questionable transaction. I don't know. But did they know? How could they have known that there was no intent to actually pay the taxes? Because that's the only way the transaction works economically. I mean, you know, why would you pay... The mid-coast is buying, you know, X dollars with, you know, a larger liability that they... How could they have believed that there's an ongoing business that could make use of the tax liability from the company that they're purchasing? Right? I have a need for your tax liability. So, okay. So it's not that you intend to write the check. It's that you intend to discharge the liability, right? You think that that liability is going to be discharged because it's going to get wrapped up in all of the other assets and tax liabilities of the purchasing entity. Can I just make sure you're answering the question I think he's asking? I would have thought you would have responded to all of this by saying, well, if Tennessee law requires some form of intent, bad faith, you lose. No, no, no. We're saying there is no... No. I said if Tennessee law requires bad faith or some intent, you lose. And I thought the premise of his question was that, hey, they're innocents. But I don't think there's... The question is whether Tennessee has some kind of bad faith requirement. I think it's an inquiry notice. If there is, I mean, courts that have looked at this transaction in other jurisdictions, some of them have held that in order to recharacterize the transaction under state fraudulent transfer law, there is this sort of knowledge of the scheme requirement. And, you know, that the taxpayers... Do you agree they didn't have that here? No, I do not agree with that. And the court found that they should have known that this transaction was not above board. Am I right that there's two types of jurisdictions? You give me the terms. But there's a dichotomy between A and B. I would have thought it was simply bad faith versus no evidence of bad faith. And the no evidence of bad faith would be the constructive fraud jurisdictions. And the others would be ones where you have to show some evidence of fraud. Have I got the dichotomy right among the state jurisdictions? There's two different questions. I mean, there's the question of constructive fraud under the UFTA. And that, there's no requirement of, you know, there's no get-out-of-jail-free card for the transferee if they had good faith or, you know, didn't know that the transfer was going to render the guy insolvent. That... So which question are you asking? Because I'm not sure I understand. I mean, there's the constructive fraud question, and then there's the question of can we recharacterize this transaction? I was asking under the constructive fraud whether they should have known. What is the evidence that they should have known that the taxes weren't going to be paid? I mean, that's the constructive knowledge question. Right. Okay. Well, I believe you said constructive fraud, and we're... That's what got us going around here. So, again, some courts have held that in order to recharacterize the transaction under state fraudulent transfer law, the taxpayers, you know, need to have either known or should have known that the transaction was not above board. And the tax court here found that the record is full of evidence that indicates that these taxpayers and their advisors, this transaction should have given them pause. And the main thing in my view that should have given them pause is this idea that a sale of a corporation that holds only cash is going to be respected for tax purposes. And, I mean, the Sixth Circuit, you know, they had... If they had looked, they could have easily found that Owens case. I mean, it had been cited in 38 judicial opinions by the time... Is Owens a case about using built-in tax obligations to be set off against someone that generates... It is a case about a corporation that had only cash and a tax liability. And the shareholder attempted, basically said, okay, I'm going to sell this corporation to these other folks. And they said, hey, we've got these net operating losses that we can use to, you know, to take care of the tax liability. And the court not only found that a sale of stock of a corporation holding only cash is meaningless and will be disregarded for tax purposes, but it also said something to the effect of, you know, it is beyond doubt that this scheme that the purchasers were talking about, about using their NOLs to offset the income of a separate business that they have purchased... I think everything you're saying makes sense from the perspective of a tax lawyer. I'm not sure it makes sense from the perspective of a run-of-the-mill citizen. They give an explanation of how the tax obligation will be paid. The transaction says they must pay it, right? The transaction did say that, right? Right. But again, you know, we are sort of looking at, from the perspective of professionals, because the knowledge or constructive knowledge of the advisors is imputed to the taxpayers. And so the advisors should have known that... What if they have an opinion that says it's okay? Well, they... What knowledge is imputed to them then? Well, I think what the tax court said was that, you know, whatever research or due diligence underlying that opinion was just woefully insufficient. That, you know, if they had truly looked into this, they would have advised against doing this transaction. Because it just, again... So how much are the taxpayers paying above what they would have paid had they done it the right way initially? I'm sorry, how much did they save from... I'm just making the point that it looks like the taxpayers have to pay more taxes than they would have paid had they paid taxes immediately after the Holiday Bowl asset sale. In other words, if you factor in the penalty and everything else... And pardon me, I'm right, right? Isn't there some material... It's conceivable that if you factor in the penalty... What is it, 50% more, 40% more, 100% more? I honestly have not... I'm not sure. I mean, again, the result is intended to get where you would have been, you know, if they had just... That's why I'm asking the question. If I think these people are generally innocent, it doesn't seem fair that they're paying more. Yeah, and I think that's attributable to the penalty. And, you know, the penalties, understatement penalties under 6662 are not discretionary. They're mandatory. If you've got an underpayment of a certain amount, it's a 20% penalty unless you can show some kind of reasonable cause. And, again, we're talking about the corporation here. And obviously the corporation couldn't show any reasonable cause. This case makes you think we should have a specialized court of appeals for tax cases a little bit. Well, I mean, just on the Sequoia loan point, I mean, I take it there's nothing new you can add to your briefs that, you know, you don't think there was risk here, not really legitimate collateral. They didn't even sign all the paperwork. So you just feel like there's no reason to respect it, I guess, is the point. Right. You know, and like I said, there have been other MIDCO cases that the government has won without disregarding the loans. And so you say, well, what's the difference? You know, and I'm not saying this is a... You lost one. You lost one in Alterman. Oh, yes, certainly, in the tax court, right. And I think, you know, possibly one of the differences is, you know, if you get the loan from a outside party, that certainly would weigh, you know, in your favor, that you got Rabobank, Nederland, even though they did hundreds of these, you know. It makes it a little more suspect when it's, you know, when it's a related party that is purportedly providing the funds. And just, you know, the idea that it's getting repaid immediately in a matter of, you know, a single day. I mean, you know, the tax court went through a litany of things that make this loan suspect. Okay. Well, I thank you for your argument, and thanks for answering our questions. We appreciate it. All right, Mr. Butler. Your Honors, with regard to Owens, the Starnes decision in the Fourth Circuit clearly distinguishes this fact pattern from Owens. And it points out that Owens is not a 6901 case, which is what the government has alleged here to recover. The way it was just characterized is you sell, you have cash, and then you've got the same problem of embedded tax liabilities and trying to do a transaction with someone who has tax losses. But here's how this fact pattern is different than Owens. What was being represented to these shareholders was the cash itself was central to the operation of the asset recovery business for Midcoast. They represented they intended to use that cash to purchase debt portfolios, which the government's expert, Mr. Hastings, testified that there are legitimate ways that that could have worked from a tax perspective. He agreed that it's just there's several different ways that they could work the problem. They knew that it was a tax avoidance transaction, right? They knew. Somebody was going to try to not pay tax. The testimony was it was tax deferral. They understood that Midcoast had a business model that would have allowed them to take its tax attributes and defer that tax or minimize that tax going forward. Tax avoidance, I would argue, Your Honor, was not proven by the government at trial. The other point I want to make is with regard to the inquiry notice standard that the court below imposed, it missed the important second step, which is what would further inquiry have uncovered regarding the true nature of the plan on the part of Midcoast. Tinknell, revenue agent Tinknell, who investigated these transactions, she had 60 of these for two years. She had subpoena power, summons power, and she interviewed the officers of Midcoast under oath, and she testified she found no fraud. It's inequitable to impose that standard on the shareholders when the agent for the government couldn't uncover it. Thank you. All right. Thanks to both of you for your helpful briefs and arguments. We appreciate it. Case will be submitted. Clerk may call the next case.